## Hogan v. Lee Fiscal Court et al.

(Decided June 20, 1930.)

S. P. STAMPER and GEORGE HOGAN for appellant.

E. B. ROSE, and C. E. TYREE for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

The fiscal court of Lee county entered into a contract with the Vincennes Bridge Company for the erection of a steel bridge on a public highway across the Kentucky river at Evelyn at the price of $40,000; that sum to be paid in three equal yearly installments. Later there was a supplemental contract relating to the enlargement of the supports of the bridge which, it was alleged, added $5,000, making a total of $45,000.

The county attorney, acting on relation of Lee county, instituted suit to enjoin the carrying out of the contract made with the Vincennes Bridge Company. The real basis of the action is that the contract creates an indebtedness, when added to pre-existing indebtedness, in excess of the revenue of the county for the year 1927, the year in which the contract was made, and that the incurring of the indebtedness is forbidden by section 157 of the Constitution. It is alleged that at the beginning of the year 1927 (whether fiscal year or calender year is not stated) Lee county was indebted in the sum of approximately $50,000 incurred by reason of appropriations made by the fiscal court prior to that time, and that such indebtedness was unpaid at the beginning of the year 1927; that at the time of the making of the contract the fiscal court had already appropriated approximately $48,000 out of the current income of the county; and that this sum was exclusive of governmental expenses which would reasonably amount to $20,000. It was therefore alleged that the indebtedness of Lee county at the time of the making of the contract was $118,000, and that the

additional $45,000 called for by the contract would bring the indebtedness up to $163,000, as against the revenues for that year of approximately $65,000.

An amended petition was filed in which it was alleged that there would be $5,000 additional cost in the construction of the bridge, bringing the total cost thereof up to $50,000; that the county had an outstanding bonded debt of $200,000; and that it was necessary to pay the interest of $14,000 yearly out of the approximate income of $65,000, which reduced the available revenues of the county for the year 1927 to $51,000.

A second amended petition was filed, in which it was alleged that at the beginning of the year 1927 Lee county was indebted in the sum of $70,000, made up of appropriations by the fiscal court in previous years, instead of $50,000 as alleged in the original petition, and that there had been appropriated out of the current funds of Lee county between the 1st day of January, 1927, and the 29th day of October, 1927, the sum of $77,300, and that the additional governmental expenses for the balance of the year would amount to $3,000, which would bring the total indebtedness of Lee county up to $150,300 on the day the contract was made, which was October 29, 1927. The amount of this indebtedness, so it was alleged, had not been authorized by a vote of the people, and that the original contract for the building of the bridge called for the expenditure of $40,000, which would bring the total indebtedness up to $190,300, as against an income for the current year of $67,579.21, instead of $65,000 as alleged in the original petition, and that after deducting an interest charge of $14,300 that must be paid on the bonded indebtedness the total revenues of the county for the year 1927 available for the payment of indebtedness would be $53,279.21. It was further alleged in the second amended petition that Lee county had entered into a contract with the state highway commission whereby it had agreed to expend $50,000 towards the construction of a certain road, and that it made a further contract for the building of a bridge across Hell creek calling for an expenditure of $4,000.

A motion was made to require the plaintiff to make his petition more specific, in that he be required to state more definitely and certainly the items going to make up the alleged indebtedness. The court referred the matter to the master commissioner, who made an exhaustive report in which he arrived at the conclusion that the out-

standing indebtedness of Lee county at the time the contract was made for the building of the bridge across the Kentucky river was, in round numbers, $60,000. A third amended petition was filed adopting the report of the commissioner as stating the true amount of indebtedness of the county at the time the contract was made, and again alleging that unpaid governmental expenses for the balance of the year would aggregate $3,000. Without attempting to give the exact figures, we may treat the indebtedness of Lee county represented by outstanding warrants and contracts at the time the contract for the building of the bridge was entered into as $60,000.

An answer was filed in which the allegations of the petitions and amended petitions were denied. It was alleged in the answer that the indebtedness of Lee county at the time of the making of the contract was only $54,-279.21, and the income for the year 1927 was alleged as $95,805.48. This sum included $29,965.75 on hand at the beginning of the year, and it was alleged that when that sum was added to the revenues of the county the total revenues of the county for that year were $117,158.04. A reply was filed and a rejoinder to the reply. Testimony was taken and the case submitted, and, upon final hearing, the chancellor adjudged that Lee county at the time it made the bridge contract could not incur an additional indebtedness in excess of $10,000, and enjoined the payment of any part of the contract price above that sum.

Carter D. Stamper was the commissioner who audited and made report on the financial affairs of Lee county at the time of the making of the contract. It appears that he did his work well. His report, the correctness of which was testified to by him with some slight modifications, showed that on April 7, 1928, when he made a settlement with the sheriff and the treasurer, the county had received revenues which when added to the amount on hand at the beginning of the year, aggregated $117,008.30, and that the disbursements amounted to $90,610.59, leaving a balance cash on hand at that date amounting to $26,397.71. A settlement of that date, however, does not decide the question presented by the record. The evidence shows that the officers of Lee county have kept their records in a satisfactory condition, but in putting the testimony in the record probably the lack of familiarity with such proceedings prevented the presentation of the exact facts which were necessary to a proper decision of such a case. For instance, it crops out in the record that the sum that was on hand at

the beginning of the year 1927 included an interest and a sinking fund. The revenues of the county, as shown in the report of the master commissioner and in the testimony of Dr. George T. Smith, treasurer of the county, probably include income that should have been allocated to some particular fund and which was not available for the payment of outstanding county warrants or the general indebtedness of the county. The county had an outstanding bonded debt of $200,000 with an annual interest charge because thereof amounting to about $14,000. There must have been a sinking fund created and yet the court is left without any light on the sources of income that go to make up the interest and sinking fund account. From a consideration of the entire record it appears that these items, or particularly the interest item, was paid out of the general revenues of the county.

Assuming that the indebtedness of the county was, in round numbers, $60,000 on the date the bridge contract was made, we have a base from which to start on our journey through the wilderness of figures to determine whether the indebtedness of the county, when the amount incurred by the terms of the contract was added, exceeded the revenues of the county for that year. The indebtedness of $60,000 cannot be accepted as a valid indebtedness against the county unless it was legally incurred. If the $60,000, or any part of it, was incurred without constitutional authority, or in violation of the provisions of the Constitution, it was no indebtedness at all and could not and should not be considered in arriving at a conclusion as to the amount of indebtedness which the county was authorized to incur on October 29, 1927. Section 157 of the Constitution not only provides that no county shall be authorized, or permitted, to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose, but it also contains a provision equally emphatic to the effect that any indebtedness contracted in violation of that section shall be void. Not satisfied with the emphasis placed upon the provisions for the protection of the citizens of a county from the improvidence of its officials, the Constitution makers added a double emphasis to the effect that no contract made with the county which incurred an indebtedness in violation of that section should be enforceable by the person with

whom made, and to clinch the whole matter they further made that section provide that no municipality should ever be authorized to assume any such invalid indebtedness.

Under that provision of the Constitution, if the outstanding indebtedness of Lee county, or any part of it, was invalid at the time the contract for the construction of the bridge was executed, such indebtedness, or such part as was invalid, could not be treated as an indebtedness of the county in arriving at a conclusion as to whether the contract would incur an indebtedness exceeding the revenues for that year. It is necessary, therefore, to determine whether that indebtedness was legal at the time the contract was made. The proof may not be entirely satisfactory as to the legality of the indebtedness, but there is proof tending to show that it was an accumulation that had been growing for more than twenty years, and that the different debts were valid in the year in which created for two or more reasons. One reason was that there had been casual deficits caused by the failure to collect taxes assessed against property, and because of exonerations and slight errors in calculations. Another reason was that the county had not levied the full constitutional tax rate, at least in some of the years. Since the opinion in the case of the City of Providence v. Providence Electric Light Co., 122 Ky. 237, 91 S. W. 664, 28 Ky. Law Rep. 1015, it has been the established rule that in determining the amount of indebtedness which a county may incur the actual revenue realized by the rate imposed is not the test, but the true test is the amount of revenue which would have been raised if the full constitutional tax rate of 50 cents on the $100 of taxable property had been imposed. That construction of section 157 of the Constitution has given rise to much of the difficulty that confronts the counties when they attempt to determine the validity of their outstanding indebtedness. To illustrate, if a county has $10,000,000 of assessable property and imposes a tax rate of 40 cents on the $100, leaving out of consideration revenue from other sources, the income of the county would be $40,000. But in the creation of an indebtedness the county would not be limited to $40,000, because if a tax rate of 50 cents on the $100 had been imposed the income of the county would have been $50,000, and the county would have been within its power if it had incurred an indebtedness of $50,000. At the end of the year, leav-

ing out of consideration other revenues, the county would have a deficit of $10,000. That deficit would represent a valid and existing indebtedness against the county. If such a state of facts should continue through a period of twenty years, the county would have an outstanding floating indebtedness of $200,000, all valid when incurred. This sum might largely exceed the entire revenues of the county for one year, and if such indebtedness must be taken care of out of the current revenues of the succeeding year, a county would be helpless to carry on its governmental affairs at all. It appears to have been written, however, in the case of McCrocklin v. Nelson County Fiscal Court, 174 Ky. 308, 192 S. W. 494, and Nelson County Fiscal Court v. McCrocklin, 175 Ky. 199, 194 S. W. 323, and City of Winchester v. Nelson, 175 Ky. 63, 193 S. W. 1040, that any valid indebtedness carried over from one year into another must be taken into consideration in ascertaining the indebtedness which the county may incur in the succeeding year. The outstanding valid indebtedness at the end of a year must be deducted from the revenue of a county for the succeeding year under these opinions, and the county may then contract debts only equal in amount to the remainder after the deduction. These opinions likewise held that fixed charges, such as salaries and other governmental expenses, must be treated as an indebtedness in determining the amount of debts which may be contracted. That means that when the aggregate of the valid outstanding floating indebtedness becomes greater than the revenues of the county for the year, the county is without power to function at all. A way was provided by section 158 of the Constitution for a county to emerge from its difficulties when it found itself in such a condition. The closing sentence in section 158 authorizes a county to fund its floating indebtedness. When the two provisions of the Constitution, section 157 and 158, are construed together, and it has always been the rule that they should be so construed, we find that a county may fund its floating indebtedness by the issuance of bonds. This means that an outstanding valid, floating indebtedness, which was created in a legal way and was valid at the time of its creation, may be funded, and when that is done the only thing which it is necessary to consider and charge up against the county in a current year is the amount of interest and the sinking fund that must be set apart to take care of the outstanding funded indebted-

ness. An illegal indebtedness is not rendered valid by funding it, and if it was illegal when created it will remain illegal for all time, regardless of what the county may do, because, under the provisions of section 157, a county may never assume the payment of a debt illegally contracted.

The court has recently so construed these sections of the Constitution in the case of Vaughn v. Corbin, 217 Ky. 521, 289 S. W. 1104; City of Covington v. O. F. Moore Co., 218 Ky. 102, 290 S. W. 1066; Baker v. Rockcastle County Court, 225 Ky. 99, 7 S. W. (2d) 846; Welch v. Nicholasville, 225 Ky. 312, 8 S. W. (2d) 400; Wilson v. Board of Education, 226 Ky. 476, 11 S. W. (2d) 143; Rowland v. City of Paris, 227 Ky. 570, 13 S. W. (2d) 791; Masonic Home v. Corbin, 229 Ky. 375, 17 S. W. (2d) 215; City of Frankfort v. John Fuss et al. (Ky.) 27 S. W. (2d) —.

The principles announced in these cases are not out of harmony with the constitutional scheme governing the creation of indebtedness by municipalities. The county in fixing its tax rate year by year left with the taxpayers the money which it might have collected by imposing a higher tax rate. At a later date the county determines that it will take from the taxpayers that which it had previously left with them and use the fund so reclaimed year by year in discharging the indebtedness which should have been paid at the time it was created. Probably it would have been better if the creditors of the county at the end of the year had taken steps to compel the fiscal court to levy the additional tax rate for the purpose of discharging the indebtedness, but that was never done.

The $60,000 indebtedness of Lee county which was outstanding at the time the bridge contract was made, upon the showing made in this record, appears to have been legal, but it had not then been funded. A few months thereafter the county did fund the indebtedness, but the validity of the contract must be determined by the status of affairs at the time it was made, and at that time there was, in round numbers, an outstanding indebtedness of $60,000 which must be taken into consideration in arriving at a conclusion as to whether the bridge contract created an indebtedness in excess of the revenues.

As we have said before, there are defects in the record which make it impossible for us to arrive at a

conclusion that can be definitely stated as a correct determination of the question. There was an outstanding indebtedness voted by the people amounting to $200,000. How much of the money derived from the ordinary county levy had been used in paying interest and creating a sinking fund cannot be certainly determined. The county was authorized to make a levy above the limit prescribed in section 157 to provide for the interest and to create a sinking fund all to be used in the discharge of the $200,000 indebtedness. There is nothing to show how much of the money had been so used or what part of the outstanding $60,000 was represented by funds so applied. It is necessary, therefore, that we treat the entire $60,000 as an outstanding indebtedness which the county must consider in determining whether it could legally enter into the bridge contract.

We have the same difficulty when we attempt to determine the revenues of the county for the year in which the contract was made. The county levy at the constitutional rate would have been about $52,000. The revenues amounted to more than $67,000 according to some of the evidence, and to as much as $95,000 according to other evidence. Taking into consideration all of the facts, the mind is left in doubt as to the true condition of the financial affairs of the county on the 29th day of October, 1927, the date on which the contract was made. The chancellor reached the conclusion that the county might contract a valid indebtedness up to $10,000, and we cannot find enough in the record to justify our reversing his judgment, as we are of the opinion he reached a conclusion as nearly correct as is possible from a consideration of the record which was before him.

It is said by counsel for appellant that the contract for the building of the bridge must be treated as a whole, and as the chancellor only enjoined the payment of anything on the contract above $10,000, his judgment should be reversed. The county is in no position to complain about the judgment of the chancellor in this respect. It was held in the case of Falls City Construction Co. v. Wolfe County, 160 Ky. 623, 170 S. W. 26, that a county might make a contract to build the foundation of a courthouse if its revenues would pay for it, or that it might contract for the building of a courthouse by piecemeal, and if a courthouse can be so built we perceive no reason why the same rule should not apply to a bridge. It is true the county did not make a contract for the building

of a part of the bridge, but the Vincennes Bridge Company is making no complaint about the judgment of the chancellor in this respect.

Judgment affirmed.

Whole court sitting.

Chief Justice THOMAS and Judges REES and DIETZMAN dissent.

### DISSENTING OPINION BY JUDGE REES.

In so far as the majority opinion holds that the fiscal court of a county may issue bonds to fund the accumulated floating indebtedness of a county without a vote of the people, and that such indebtedness is not subject to the limitations imposed by section 158 of the Constitution, I must dissent. My views on these questions are set forth in the dissenting opinion this day filed in the case of City of Frankfort v. Fuss, 235 Ky. 143, 27 S. W. (2d) —.

Chief Justice THOMAS and Judge DIETZMAN concur in this dissent.